Good morning, Your Honors, Counsel. We're here on an attempt to reverse a summary judgment which was based on a finding of a Dr. Grody that the plaintiff, Deputy Milliman, was unfit for duty. Now, before we get to Dr. Grody, it's important to note that Sheriff Nygren originally ordered Deputy Milliman to sit for a fitness for duty test with a psychologist who had a relationship with Sheriff Nygren and was a campaign contributor to Sheriff Nygren. So it's our contention that from the beginning, Sheriff Nygren was trying to control the outcome of the fitness for duty testing. And here's how they did it. Prior to Dr. Grody examining Mr. Milliman, there were conversations between the defendants and Dr. Grody. Nygren told Dr. Grody that the allegations of corruption in the Sheriff's Department were, in fact, not true. Though for purposes of summary judgment, of course, we must believe that his allegations were true. Defendant Miller also questioned Mr. Milliman's honesty by pointing to a class action that he was involved in relative to the brain cancer that he had He was in question for making these allegations when, in fact, Miller admitted at his deposition that he had no factual basis for making that statement. The district court judge said honesty wasn't an issue, but honesty is discussed in Dr. Grody's decision. And the fact is, if Milliman is viewed as being dishonest, that certainly is going to have an effect on Dr. Grody's decision. Importantly, Miller and Nygren had other conversations with Dr. Grody, and they both raised the issue of what would happen depending upon Dr. Grody's decision. And the message they sent to Dr. Grody was very simple. If you find him unfit, he will be able to retire or go on disability. If you find him fit, then he'll be terminated. So Dr. Grody was set up from the beginning to feel that he might be doing Deputy Milliman a favor by finding him unfit. Why isn't that true? It's not that it's not true. It is true. But that's not the basis Dr. Grody should be using to make his decision as to fitness or unfitness. The district court judge says, yes, there was nothing factually untrue about that. My response is, why did they tell Dr. Grody that? How did that relate to the decision that he had to make? It could only influence him to go in one direction. District court judge also said that telling this to Dr. Grody showed that they were indifferent to whether or not he was found fit or unfit. And we would contend that that is the court impermissibly drawing an inference in favor of the defendants rather than the inference that we're asking for here. The judge went further and said that because the defendants encouraged Milliman to apply for disability after the finding by Dr. Grody, that that suggested that plaintiff's inference is improper, that in fact they were not trying to influence the decision. Again, that's the district court drawing the inferences that the district court wanted to draw rather than those favorable to Mr. Milliman. They also had an impact, the defendants, on information provided to Dr. Grody. There was an incident at the Prate household where Mr. Milliman had contact with local police in Algonquin. They provided one police report to Dr. Grody and not the supplemental report. In the supplemental report it showed that the person who called the police, made the complaint, was satisfied after the police arrived and realized nothing was going on untoward. Dr. Grody did not have that because it was not given to him by the defendants. So he indicated that it was bad judgment on Milliman's part to be there. And specifically references the reaction of the husband as Mr. Milliman was sitting at a kitchen table studying for a real estate exam with one of his students who resided there. Defendant Miller prepared a memo and although he denied that he gave this memo to Dr. Grody, Dr. Grody in fact had the first page of that memo in his file and that was subpoenaed. In the memo, Miller indicated that the FBI had not conducted any kind of an investigation in this case. While of course Milliman was telling Dr. Grody as he testified at his deposition that he worked undercover for a series of years with the FBI and that there in fact was an investigation. Dr. Grody specifically referenced the lack of an FBI investigation as being the basis for saying there was no corroboration of what Mr. Milliman was saying. Dr. Grody even references in his opinion that his opinions might change if he had more information about the FBI or more information about what happened at the Prate residence, specifically the issues that he had been misled on. It is our contention that there is a jury question that has to be decided by a jury as to whether or not the defendant succeeded in manipulating Dr. Grody in his findings. Dr. Grody indicated that two subtests on the MMPI, these are the written psychological tests that he did, that two subtests showed that Milliman was paranoid and felt prosecuted. Although this finding was not supported by any of the other psychological testing, but Grody made a fatal admission at his deposition. He indicated first that in fact this finding, this feeling of being persecuted or being paranoid, that that could come either because that's his mental state, that's how he is, a long-standing situation, or it could be his state right now with this testing having taken place weeks after he was placed on administrative leave and was clearly aware that they were greasing the skids to have him terminated. When Dr. Grody was asked at his deposition, what you're saying is whether or not it's his state, how he feels that day, or a trait, a long-standing thing, that's something you can't really determine based on the testing. Grody answered, correct. Now, let's remember that this is the same Dr. Grody that examined Milliman for Fitness for Duty in 2003 when he returned from his treatments for brain cancer and he was found fit. As Dr. Grody admitted, and as Dr. Dawkins, who I'll talk about in a moment, who also examined his testing, indicated, the testing was almost identical from 2003 and 2011, yet there was a different result. Isn't there a different result because of a difference in his condition? No, I don't believe so, Your Honor, and here's why. The key factor is this MMPI-2 test where Grody had to decide, which way do I go? Am I picking up a reaction to his having been put on administrative leave, knows he's going through this Fitness for Testing duty to determine whether or not he's going to be terminated, or do I go and say this is a long-standing trait? Since there's no other evidence in the psych testing that indicates that he was paranoid or had any kind of a problem, and in fact, no issue that he experienced at work that indicate there were problems along those lines. Now, he received an evaluation after he was on administrative leave that covered the prior year. It was a meet standards evaluation. It was many complimentary statements made in it, and the evidence shows that even the defendants themselves testified that they saw no reason when he worked up to the time he gave that fateful deposition that he had any psychological problems or there's anything even to be looked at. Dr. Dawkins was retained by Deputy Milliman to examine the testing that had been done several years earlier. Her conclusions were that the psych testing, nothing in the psych testing justified finding Deputy Milliman unfit for duty. She concluded that Dr. Grody was too dependent upon outside information rather than the results of his own testing, which is exactly the argument that we're making here. She said the defendant, pardon me, the defendants, interestingly, have not identified any expert to refute what Dr. Dawkins said. Her conclusions stand unrefuted. But she wouldn't give an opinion on fitness for duty. She wouldn't judge. All she could do is say this is what the testing showed back when it was done. She did her work years later. She did not do independent testing because his mental state at that point really wasn't relevant. It was at the time he was terminated. She did not make a judgment because she did not feel it was appropriate for someone who did not examine him at the time to reach that opinion. She criticized Dr. Grody's approach, I think, not his ultimate decision, right? Well, that's half right, Your Honor. She said that the testing did not support a finding of unfit and that she was universally strong on the whole way. The testing did not justify his being unfit. So it had to be these other things, these extraneous matters. And that's why it's a jury question, Judge. It's a question the jury has to look at. Clearly, there was an attempt to influence the outcome of this fitness for duty testing. The question then for the jury becomes did they succeed? And I think there's plenty enough evidence here to show that they did. The fact that he references, Dr. Grody specifically references, the Prate incident and the lack of an FBI investigation, when in fact there was 187, I think, pages of investigatory materials that the FBI turned over. Do you want to save some time for rebuttal? I do, Judge. I don't want to cut you off. I just wanted to remind you. Well, no, that's fine. I'll save the rest of my time. All right.  Thank you, Mr. Crooks. Mr. Brojims. May it please the Court. Counsel. I want to start out by addressing some of the things that counsel put forward that are incorrect. There were no discussions with Dr. Grody before the assessment. There were discussions with Dr. Grody by Sheriff Nygren and Commander Miller after the assessment, but those were in addition to other assessments. Those were in addition to other conversations that Dr. Grody had with also the plaintiff's wife and plaintiff's friend, Deputy Bowden. These conversations are called collateral sources that psychologists like Dr. Grody would use to get a 360-degree view of the plaintiff. Dr. Grody asked the plaintiff for permission to speak to these people, and the plaintiff gave that permission. After Dr. Grody's assessment of the plaintiff, a full-day assessment that included both an interview and cognitive mental health tests, Dr. Grody then spoke to these people to get additional information. The plaintiff also said that Dr. Grody's findings were contingent on honesty, but Dr. Grody specifically disclaimed that whether the truth of any of the allegations came forward would not change what he saw. He said, in fact, and the district court quoted, that new or different information that may come out in the future would not undo the problems that are seen at the present. Again, Dr. Grody spent a full day with Mr. Milliman and found that he suffered from various mental health issues. Based on the totality of everything, he put together a 15-page report that was then forwarded on to Sheriff Nygren and the other defendants. What's important to note is that after that report was forwarded on, the plaintiff's own actions. He did not seek a reassessment. He did not seek to provide additional information to Dr. Grody or provide other witnesses for Dr. Grody to interview, as Dr. Grody had offered. In addition, the plaintiff did not seek a second opinion. Instead, the plaintiff went forward and sought disability. Unfortunately, he stopped seeking disability, at which point Sheriff Nygren was faced with an uncontradicted report of Dr. Grody that said the plaintiff suffered from mental health issues that impacted his ability to perform his job. The plaintiff also stated that Dr. Grody made a fatal admission that the MMPI results could indicate state versus a constant underlying condition. But that is not true. Dr. Grody said that they could do that, and it would impact things in part, but not in total. The reality is there were multiple things that Dr. Grody saw that impacted his opinions and findings of the plaintiff's condition. The plaintiff also relies on his expert, Dr. Dawkins. However, Dr. Dawkins was his third retained expert in this case, and she comes late to the party. She wasn't there for Sheriff Nygren to review any findings she had. Again, Sheriff Nygren, when he made his reasonable decision, he only had Dr. Grody's report. Dr. Dawkins comes later. And what's important to note with Dr. Dawkins is that she does not contradict Dr. Grody's conclusion or say that he was wrong. She also does not opine on the plaintiff's fitness at this time, even though she had the benefit of reviewing Dr. Grody's notes, his testing results, the collateral information, which she confirms was appropriate. And in addition, she performed her own tests on the plaintiff, yet for some reason she did not score those tests. And again, at the end of the day, she cannot provide an opinion that the plaintiff is fit, which is very telling, because, again, even today we're still faced with only one psychologist has opined about plaintiff's fitness, and that is Dr. Grody. Counsel, is it correct that the evaluation here was ordered because of the speech the plaintiff argues is constitutionally protected? Judge, that was part of it. Again, the plaintiff made a speech, and so an investigation was undertaken into those accusations. And is it also correct that the Sheriff's Department's internal file on this was labeled Termination Review? Yes, Judge. It was labeled Termination Review, but they also, in addition to reviewing the accusations, they also did this mental health fitness that the plaintiff spent most of his time discussing for Dr. Grody. Right, which he argues was pretextual. Yes, Judge. So why is it unreasonable to say, okay, we've got constitutionally protected speech, arguably, that prompts this termination review, and a jury might reasonably find that it was the protected speech, then, that led to the decision to terminate? In this case, we have Dr. Grody's findings that the plaintiff was unfit, that breaks the chain of causation between the alleged unconstitutional speech. And so the issue then turns on the independence of Grody's opinion, correct? Yes. It turns on whether Dr. Grody's opinion was a proper opinion and whether Sheriff Nygren reasonably relied upon it. Or whether, as plaintiffs suggest, Sheriff Nygren influenced it inappropriately, right? Yes, that is a concern. And in this case, the evidence shows that there was no influence. Again, Dr. Grody specifically testified that he was not misled, he was not influenced, and he was not pressured. That is uncontradicted evidence. Plaintiff's expert at best can attempt to criticize Dr. Grody's methods or where he put reliance, but she can't say that his findings were wrong or his conclusion was wrong. And again, Dr. Grody had a 15-page report that was thorough and well-reasoned, according to plaintiff's own expert, Dr. Dawkins. In addition, Dr. Dawkins explained that there was a psychological basis for concern based on the plaintiff's accusations, and therefore she concurred that a mental health assessment was appropriate for the plaintiff in this case. And there's also no evidence that any deputy was treated any differently than plaintiff was. There's no evidence of any other deputies being treated differently or plaintiff being treated than any deputy, so the mental health assessment referral was appropriate. And again, plaintiff's speculation is notóhe doesn't point to any specific facts to support his speculation of this alleged influence of Dr. Grody. Dr. Grody specifically denies it, and Dr. Dawkins cannot support it. There is also an additional reason why this report should be affirmed, and that's qualified immunity. The district court did not get to qualified immunity because they found that Dr. Grody's opinion was a separate basis that justified termination that broke any chain of causation between any alleged constitutional speech. Qualified immunity would apply in this case because the Supreme Court recently reiterated whether the law is clearly established must be particularized to the facts of the case. In this case, we have very unique facts. We have an independent physician, Dr. Grody, who reviewed and assessed the plaintiff. Suppose, though, you accept the plaintiff's case, right? Because that's what you have to do to decide qualified immunity. And what you've got is, in essence, a pretextual psychological exam tainted by the sheriff. And again, we disagree that it's aó I understand you disagree with that, but for purposes of qualified immunity, I would think that has to beóyou'd have to be arguing that even under the plaintiff's version of the facts, the law is not clearly established. I would think that's pretty clearly established. Well, Judge, I think it's more difficult than that because, again, plaintiff's theory that he somehow influenced Dr. Grodyóagain, Dr. Grody's report is a 15-page report, single-spaced, well laid out, and specifically talks about his communications with Sheriff Nygren and Deputy Miller. There's no support for that inference. He points to no evidence to support it. Again, it's a speculation that's not found. That's merits, not qualified immunity. Yes. Okay. And so for qualified immunity at the time, Sheriff Nygren had one report from one doctor, Dr. Grody, that said the plaintiff was unfit. It was reasonable for him to rely on that at that time because he was notóthere was no conflicting evidence. Again, that was the only report he had. Even if Nygren himself had influenced that in order to suppress the speech? No, because Nygrenó That would be a constitutional problem, right? But in this case, there's no evidence of Nygren's influence in the speech. And that's theóokay. I don't mean to pickó Perhaps I'm missing it. Sorry, Judge. What I'm trying to suggest is that your qualified immunity argument doesn't add anything to the case, that if plaintiff can show his version of the facts, that violates clearly established constitutional law. Now, I understand you're saying he doesn't have the evidence to support that theory. I understand that, but you're arguing for a version of constitutional law that would be very troubling. Yes, Judge. So, again, our main argument is the plaintiff does not have the facts to support it because there's a break in causation. The qualified immunity, again, is based predominantly on the break in causation and the reasonableness of Sheriff Nygren. One last point. Plaintiff also argues that there's no contradictory evidence or contradictory expert to Dr. Dawkins. However, this case went to summary judgment prior to defendant's disclosure of any expert, so any comment that there's no rebuttal to Dr. Dawkins is disingenuous because at the time of summary judgment we had not had an opportunity. Again, we believe this case is based on plaintiff's rank speculation about what would have happened without pointing to any specific facts to support that speculation. Plaintiff's own expert cannot support his case and plaintiff's own actions after Dr. Brody's findings support the district court's findings. If there are no further questions, we will stand on our brief. I ask this report to respectfully affirm the district court. Thank you. Thank you. Mr. Crooks. Very quickly, and I apologize if I misspoke about whether the communication between Brody and the defendants were before the assessment. They were before his report was written, clearly, because he discusses that in his report. Counsel references Nygren's reasonable decision. We must admit that for purposes of summary judgment, plaintiff's testimony was accurate about the corruption. If Nygren knows that the testimony at that deposition was true, how is it a reasonable decision that he goes with Dr. Brody? If he knows that he has attempted to and apparently succeeded in influencing the decision of Dr. Brody, how is that decision reasonable? Counsel points to a statement in Dr. Brody's report where he said that even if he got more information on the FDI of the case, it wouldn't change his decision. Well, he made that statement right after he made the statement that some of his opinions could change if he had more information. So we've got two apparently contradictory statements back-to-back in his report. I think a jury has to look at that and make that decision. Counsel said that Brody was not misled. Brody was misled. His reference to no defense expert, it wasn't that they were not given the opportunity. They could have identified a psychologist as an expert to respond to Dr. Dawkins. They chose not to. I think that's because they couldn't find one that would look at the psychological testing and conclude he was unfit. The question of qualified immunity in my mind is settled by the Christofek case, which reversed a grant of summary judgment on a very, very similar fact pattern that we find here. In fact, I think Deputy Milliman's argument is stronger than was the plaintiff's in that case. And I've also cited cases, and I'll read the quote, where a defendant fabricates information and falsely testifies, quote, that is not the type of conduct for which qualified immunity applies. And I would indicate that here where they have deliberately manipulated the reviewer, the doctor who's going to do the testing, and there's evidence from which you can infer it impacted on his decision, but that cannot be an independent basis for the finding here. We'd ask that, oh, and in addition, their factual attack on Dr. Dawkins and their briefs was all in violation of 56.1, citing to the wrong record, rather than having it part of their 56.1 statements. And I think that's reason enough to reverse or at least to. . . I don't understand that argument. I thought they cited Dr. Dawkins' testimony. They cited the testimony appended to their summary judgment motion. What's wrong with that? The cases I have cited indicate you're to cite to the rule 56.1 statements. These are decisions from the District Court of the Northern District of Illinois? Correct, yes. I'll just say I usually like to see citations to the actual evidence. Well, and I understand that, Your Honor, but what you do is you cite your 56.1 statement, and from that you can go to the record if you want to look at the specific testimony. But if it's not in the 56.1 statement, then I never had a chance to respond to it in the District Court. When they file their statement of facts, I get a chance to respond to it and rebut certain things or add some nuance to these statements. We did not have that opportunity, and I think the case law, it's in my brief, I think it's quite strong. Thank you. Thank you, Mr. Crooks. Thanks to all counsel. The case is taken under advisement, and the court will proceed to the fifth.